# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAKE THE ROAD NEW YORK, 301 Grove Street, Brooklyn, NY 11237 | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) ) No. 25-cv-4455 |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, 245 Murray Lane, SW, Washington, DC 20528; | ) ) ) ) |
| TODD LYONS, Acting Director of the U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th St., SW, Washington, DC 20536; | ) ) ) ) |
| JOSEPH B. EDLOW,  Director of U.S. Citizenship and Immigration Services, in his official capacity, 5900 Capital Gateway Drive, Camp Springs, MD 20746; | ) ) ) ) |
| RODNEY S. SCOTT, Commissioner for U.S. Customs and Border Protection, in his official capacity, 1300 Pennsylvania Avenue, NW, Washington, DC 20229; | ) ) ) ) |
| PAM BONDI, Attorney General of the United States, in her official capacity, 950 Pennsylvania Avenue, NW, Washington, DC 20530; | ) ) ) ) |
| *Defendants.* | ) ) ) |

**COMPLAINT**

(Violation of Immigration and Nationality Act, Administrative Procedure Act, and Due Process)

**INTRODUCTION**

1.      This case challenges a guidance document made public on October 20, 2025, and other undisclosed guidance, concerning the Trump Administration's decision to dramatically expand "expedited removal," under which low-level Department of Homeland Security ("DHS") immigration officers summarily deport individuals from the United States without any meaningful review, much less court review.

2.      Plaintiff challenged the expansion itself and a prior publicly-disclosed guidance memorandum in *Make the Road New York v. Noem*, No. 25-cv-0190 (JMC).  It now files this action to challenge different guidance concerning the expansion of expedited removal that was first made public in October 2025, and to other undisclosed writings concerning the expansion.

3.      Under expedited removal, DHS deports individuals subject to expedited removal soon after apprehension, without any opportunity to speak with an attorney; to gather evidence or call witnesses; or to present a claim for relief from removal, other than a truncated process for those who express fear of persecution.

4.      Expanding the expedited removal process to the interior of the country is a major departure from a century-long norm of providing all noncitizens within the United States with notice, access to counsel, an opportunity to prepare, and a contested hearing when they face removal.  Since it was created nearly three decades ago, federal immigration authorities have applied expedited removal in limited circumstances: to noncitizens who are seeking admission at a port of entry, who have been apprehended near the border shortly after they entered the country, or who arrive in the United States by sea.

1

5.      On January 21, 2025, the Administration issued, and made immediately effective, a new rule that dramatically expands the reach of expedited removal to individuals located anywhere in the country who cannot prove they have been continuously present in the United States for more than two years.  *See* U.S. Dep't of Homeland Sec., Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 ("Rule") (published Jan. 24, 2025).

6.      The Administration's decision to expand expedited removal to a vast group of noncitizens living anywhere in the United States disregards nearly three decades of experience showing that the expedited removal process, even when used at the border for new arrivals, is rife with errors and results in widespread violations of individuals' legal rights.  That experience shows that the government has erroneously deported numerous individuals through expedited removal, including U.S. citizens and individuals with bona fide fears of persecution in their countries of origin.  Numerous reports, including comprehensive studies commissioned by Congress, have extensively documented the widespread abuse and serious flaws in the expedited removal process at the border.

7.      The expansion means that low-level DHS officers can now immediately and without process subject individuals in the interior of the United States to expedited removal, without any consideration of their family ties—including ties to U.S. citizen or lawful permanent resident family members—or their ties to their communities.  Moreover, current procedures place the burden of proof on the individual to show that he or she is not subject to expedited removal, yet fail to provide time or a meaningful opportunity for the individual to do so. As a result, countless noncitizens will likely have expedited removal erroneously applied to them.

8.      On October 20, 2025, Defendants publicly disclosed a guidance document issued by Former Acting Director of ICE, Caleb Vitello, dated February 28, 2025 and titled

"Implementation Guidance for January 2025 Federal Register Notice, Designating Aliens for Expedited Removal" ("February 28 Guidance"), *available at* https://perma.cc/F32Y-NJ8R. *See* FOIA ICE Library, U.S. Immigr. & Customs Enf't, https://perma.cc/R5U9-WFAE (Nov. 1, 2025).

9.    The February 28 Guidance is illegal.  Among other flaws, it fails to provide sufficient procedures to guard against erroneous placement into expedited removal.  Without relief from this Court, individuals living anywhere in this country are at risk of being separated from their families and expelled from the country without any meaningful process.

10.    On information and belief, Defendants have issued additional undisclosed writings to implement the Rule (collectively "Undisclosed Guidance") that suffer from similar defects and are likewise unlawful.

## JURISDICTION AND VENUE

11.     This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing regulations; and the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

12.    The Court has jurisdiction under 8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) is a provision of the INA that provides jurisdiction in the United States District Court for the District of Columbia over "[c]hallenges [to the] validity of the system," including regulations and "written" policies regarding expedited removal.  The Court also has jurisdiction under 28 U.S.C. § 1331.

13.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

14.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

15.     MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.

16.     MRNY's members are subject to the expansion of expedited removal and risk erroneous placement into and removal pursuant to expedited removal as a result of the February 28 Guidance and other Undisclosed Guidance.

17.     Defendant Kristi Noem is sued in her official capacity as the Secretary of DHS. In this capacity, she directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to designate categories of noncitizens subject to expedited removal and to grant asylum or other relief.

18.     Defendant Todd Lyons is sued in his official capacity as the Acting Director of ICE.

4

19.     Defendant Rodney S. Scott is sued in his official capacity as the Commissioner for CBP.

20.     Defendant Joseph B. Edlow is sued in his official capacity as the Director of USCIS.

21.     Defendant Pam Bondi is sued in her official capacity as the Attorney General of the United States.  In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration Review ("EOIR") (the administrative immigration court system), and is empowered to grant asylum or other relief.

## FACTS

### A.     The Trump Administration's Decision to Expand Expedited Removal and Issuance of the February 28 Guidance.

22.     On January 20, 2025, President Trump signed an Executive Order titled "Protecting the American People Against Invasion."  In relevant part, the Executive Order emphasizes that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens" and "achieve the total and efficient enforcement of those laws." *See* Executive Order, § 2.

23.     Consistent with the President's goal of deporting millions of immigrants from the United States, section 9 of the Executive Order directs the DHS Secretary to "take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II)."

24.     On January 21, 2025, DHS issued the Rule in the form of a Federal Register Notice, which was published in the Federal Register on January 24, 2025, that authorizes the

application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years.  The effective date of the Rule was January 21.

25.    As a result, noncitizens who have resided in the country for less than two years continuously are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States, or the availability of claims for relief from and defenses to removal.  Even individuals who are not properly subject to expedited removal (for example, U.S. citizens or individuals who have been continuously present for more than two years)—or to removal at all—can be summarily removed if they are unable to affirmatively prove those facts to the satisfaction of an immigration officer.

26.    On January 23, 2025, Benjamine C. Huffman, the then-Acting Director of DHS, issued a Memorandum entitled "Guidance Regarding How to Exercise Enforcement Discretion" to implement both the January 21, 2025 Rule and January 20, 2025 Memorandum entitled "Exercising Appropriate Discretion Under Parole Authority."  Benjamine C. Huffman, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("January 23 Guidance"), https://perma.cc/RH7Y-DKDQ.  The January 23, 2025 Guidance directs that, for "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," officers should "[t]ake all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal.  This may include steps to terminate any ongoing removal proceeding."  The January 23 Guidance additionally states:

> Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so

6

in a timely manner. *See* 8 U.S.C. § 1225(b)(l). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id*. § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

*Id*. at 2.  Thus, the January 23 Guidance contemplates placement of individuals whose applications for asylum are pending into expedited removal under the Rule.

27.    On October 20, 2025, Defendants publicly disclosed for the first time the February 28 Guidance.  Defendants posted the February 28 Guidance online the same day Defendants filed an appellate brief before the U.S. Court of Appeals for the D.C. Circuit in a case reviewing the legality of the Rule and January 23 Guidance.  *See* FOIA ICE Library, U.S. Immigr. & Customs Enf't, https://perma.cc/R5U9-WFAE (Nov. 1, 2025); Brief for Appellants 10, 16-17, *Make the Road New York v. Noem*, No. 25-5320 (D.C. Cir. Oct. 20, 2025).

28.    The February 28 Guidance is directed to "All ICE Employees" without reference to officers of CBP or other federal agencies, even though many such officers are conducting immigration enforcement operations across the United States.  February 28 Guidance at 1.

29.    Among other things, the February 28 Guidance states that each person encountered by ICE and designated for expedited removal "bears the affirmative burden to show to the satisfaction of the encountering immigration officer" continuous presence "for the two-year period immediately preceding the date of the determination of inadmissibility by providing evidence establishing the place, date, and manner of entry into the United States and continuity of presence since that time."  *Id.* at 3.  However, it does not include any requirement to provide notice that two years of continuous presence exempts a person from expedited removal and that the noncitizen bears the burden of showing such presence.  *See id.* at 1-4.

7

30.     While the February 28 Guidance lists forms of evidence that "may" demonstrate continuous presence and allows an officer to permit an individual who "claims to have access to such evidence . . . a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence," it does not provide a guarantee of adequate time to obtain or present such evidence, nor does it provide for any mechanism for noncitizens to view or contest adverse evidence, or afford them an opportunity to be heard before a neutral adjudicator as to the critical question of continuous presence.  *Id*. at 3.  The February 28 Guidance also states that ICE officers may but need not consider mental competency, eligibility for relief, or duration of presence when deciding whether to place noncitizens in expedited removal and notes that the Rule does not apply to applicants for admission who fall into the category of unaccompanied alien children as defined in 6 U.S.C. § 279(g)(2).  *Id.*

31.     The February 28 Guidance additionally provides that ICE may "terminate any ongoing removal proceedings" of current applicants and place them into expedited removal, *id.*, and that for those applicants who have a notice to appear already filed in immigration court, the "Office of the Principal Legal Advisor may move the immigration judge to dismiss proceedings . . . because 'circumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.'"  *Id.* (citing 8 C.F.R. § 239.2(a)(7)).

32.     The February Guidance further references a "specialized *Expedited Removal Refresher and January 2025 Designation* training on the ICE Training System portal" that must be completed by ICE officers and agents within 30 days of the date this memorandum is issued. *Id.* at 4.  Upon information and belief, these training documents are among the further

Undisclosed Guidance that Defendants have issued to implement the Rule, and suffer from similar defects as the February 28 Guidance.

**B.    History of Expedited Removal.**

33.    Prior to 1996, noncitizens generally were entitled to a full hearing in immigration court before they could be removed, whether they were seeking entry at the border or had already entered the country.  They also were entitled to administrative appellate review before the Board of Immigration Appeals ("BIA" or "Board") and judicial review in federal court.

34.    In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").  The Act generally retained the procedures for removal hearings for all noncitizens—i.e., full immigration court hearings, appellate review before the BIA, and federal court review.  8 U.S.C. § 1229a; 8 U.S.C. § 1252(a) *et seq.*  In these regular removal proceedings (commonly referred to as "Section 240" proceedings), the noncitizen has a number of procedural rights, including the right to an adversarial hearing before an immigration judge, and the right to retain and be represented by counsel.  Noncitizens can contest the factual and legal allegations against them and apply for relief from removal, including asylum.  Noncitizens also can move to terminate the proceedings or suppress evidence based on an unlawful arrest. Moreover, noncitizens in Section 240 proceedings are entitled to an administrative appeal to the BIA along with an automatic stay of deportation while the appeal is pending, and to seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals.

35.    IIRIRA also created a highly truncated removal process called "expedited removal" for certain individuals coming to the United States who are inadmissible because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8

U.S.C. § 1182(a)(6)(C), or they lack the requisite documents for admission, 8 U.S.C. § 1182(a)(7).  *See* 8 U.S.C. § 1225(b)(1).  Expedited removal applies only to noncitizens charged under those specific grounds of inadmissibility and does not apply to noncitizens removable for other reasons.  *See* 8 C.F.R. §§ 235.3(b)(1), (b)(3).

36.    Noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).

37.    Individuals who express a fear of persecution or an intention to apply for asylum are entitled to an additional truncated screening process, *see* 8 U.S.C. § 1225(b)(1), but nothing remotely approaching a full immigration court hearing unless they pass the screening.  If they pass the screening, the expedited removal order is cancelled and they are permitted to apply for asylum and any other form of relief or protection for which they are eligible in full Section 240 proceedings.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

38.    IIRIRA authorized the use of expedited removal for individuals who were applying for admission at a port of entry.  *See* 8 U.S.C. § 1225(b)(1).

39.    IIRIRA also included a provision allowing the Attorney General to apply expedited removal to individuals who had entered the country but had never been officially admitted—i.e., individuals who had crossed the border without presenting themselves for inspection.  *See* 8 U.S.C. § 1225(b)(1).  Under that provision, the Attorney General could apply expedited removal to noncitizens residing anywhere in the United States who cannot prove to an immigration officer's "satisfaction" that they have been continuously physically present for two years and were lawfully admitted or paroled into the country.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. § 235.3(b)(6).

40.      However, IIRIRA provided that, before the Attorney General could apply

expedited removal to noncitizens apprehended inside the country, the Attorney General would

have to affirmatively designate which noncitizens would be included.  *See* 8 U.S.C. § 1225(b)(1)

(A)(iii)(I).[1]

41.      From the time the expedited removal provisions took effect in 1997 until 2002,

the government did not apply expedited removal to individuals who had entered the country.

Instead, it applied expedited removal only to inadmissible noncitizens arriving at ports of entry.

*See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10312 (Mar. 6, 1997).

42.      In 2002, the government first invoked its authority to apply expedited removal to

persons already inside the country, but limited application to a narrow group of individuals who

arrived by *sea* without being admitted or paroled and who were apprehended within two years of

entry.  *See* Notice Designating Aliens Subject to Expedited Removal Under Section

235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

43.      Beginning in 2004, the government authorized the application of expedited

removal to individuals who entered by means other than sea, but only if they were apprehended

within 100 miles of a land border and were unable to demonstrate that they had been

continuously physically present in the United States for 14 days.  *See* Designating Aliens for

Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

---

[1] Under the Homeland Security Act of 2002, the Immigration and Naturalization Service
("INS"), under the direction of the Attorney General, ceased to exist and its functions were
transferred to DHS, effective March 1, 2003.  *See* Homeland Security Act of 2002, Pub. L. No.
107-296, 116 Stat. 2135 (Nov. 25, 2002).  As a result, statutory references to the INS or its
officers are deemed to have been replaced by reference to DHS or the applicable DHS official.
*See* 6 U.S.C. § 557.

44.     Thus, between 1997 and 2019, with the limited exception of noncitizens who arrived by sea, immigration authorities never sought to apply expedited removal to noncitizens apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

45.     On July 23, 2019, at the direction of President Trump, DHS published a Federal Register Notice that authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show they have been continuously present in the United States for longer than two years.  *See* 84 Fed. Reg. at 35409.  The District Court for the District of Columbia preliminary enjoined the Rule. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019).  The D.C. Circuit vacated the preliminary injunction in a published decision.  *See Make the Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

46.     On February 2, 2021, President Biden issued an Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border ("E.O. on Migration").  *See* E.O. 14010, 86 FR 8267 (Feb. 5, 2021).  The E.O. on Migration directed the Secretary of Homeland Security to review the July 2019 Notice and consider, *inter alia*, legal and humanitarian obligations, and constitutional principles of due process and other applicable law.

47.     In light of the E.O. on Migration, this Court stayed its consideration of a renewed motion for preliminary injunction challenging the 2019 Rule.  Minute Order, *Make the Road v. McAleenan*, 1:19-cv-02369-JMC (D.D.C. Feb. 8, 2021).

48.     On March 21, 2022, the Department of Homeland Security (DHS) rescinded the 2019 Rule.  *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited

Removal, 87 Fed. Reg. 16022 (March 21, 2022).  In the period the 2019 expansion was in effect, the Rule was used in an exceedingly small number of cases.

C.    **The Expedited Removal Process.**

49.    The expedited removal statute provides that the process begins—and often effectively concludes—with an inspection by an immigration officer.

50.    That officer must determine whether the individual has been continuously present in the United States for less than two years; is a noncitizen; and is inadmissible because he or she has engaged in certain kinds of fraud or lacks valid entry documents "at the time of . . . application for admission."  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

51.    If an individual claims to be a U.S. citizen, to have been admitted as a lawful permanent resident or refugee, or to have been granted asylum (in which case the individual cannot be subject to expedited removal), then the individual is entitled to limited additional review.  *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5).

52.    Otherwise, if the officer concludes that the individual is inadmissible under an applicable ground, the officer "shall," with simply the concurrence of a supervisor, 8 C.F.R. § 235.3(b)(7), order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).

53.    Thus, a low-level DHS officer can order the removal of an individual who has been living in the United States with virtually no administrative process—just completion of cursory paperwork—based only on the officer's own conclusions that the individual has not been admitted or paroled, that the individual has not adequately shown the requisite continuous

13

physical presence, and that the individual is inadmissible on one of the two specified grounds. Once a determination on inadmissibility is made, removal can occur rapidly, within twenty-four hours.

54.    For those who fear return to their countries of origin, the expedited removal statute provides a limited additional screening.  But the additional screening, to the extent it occurs, does not remotely approach the type of process that asylum seekers receive in regular Section 240 immigration proceedings.

55.    During the inspection process, if an individual indicates an intention to apply for asylum or expresses fear of return to his or her country of origin, the immigration officer must refer the individual for a rudimentary screening interview with an asylum officer, referred to as a "credible fear" interview, to determine whether the individual should be able to apply for asylum and related humanitarian relief.  8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30(d)-(e).

56.    To prevail at the credible fear interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).

57.    Applicants who satisfy the credible fear standard have their expedited removal orders cancelled by operation of law and are placed into Section 240 removal proceedings, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an immigration judge, preserve objections, and appeal any adverse decision to the BIA and court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

14

58.     Applicants who do not pass the credible fear interview may request review of the decision by an immigration judge, but do not receive a full hearing or any subsequent administrative appellate review.  8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).  During the inspection and credible fear stages of expedited removal, DHS generally detains the noncitizen.  8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

59.     An expedited removal order comes with significant consequences beyond removal itself.  Noncitizens who are issued expedited removal orders are subject to a five-year bar on admission to the United States unless they qualify for a discretionary waiver.  8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2.  Similarly, noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver.  8 U.S.C. § 1182(a)(6)(C).

**D.     Widespread Flaws in the Government's Expedited Removal Policies.**

60.     The government's expedited removal policies suffer from numerous serious deficiencies.  The February 28 Guidance and other Undisclosed Guidance will only result in more erroneous removals and rights violations.  Any individual may be apprehended by immigration authorities in any location and summarily removed without a meaningful process to test whether that individual is properly subject to arrest, to expedited removal, or even to removal at all.

*Flaws in the Procedures for Inspection by Immigration Officers*

61.     Under expedited removal, an individual who seeks to contest many of the critical factual or legal requisites for expedited removal—admission or parole, inadmissibility, or the requisite continuous physical presence in the country—receives no meaningful opportunity to do

so.  The individual bears the burden of proving certain critical facts.  *See*

8 U.S.C. § 1225(b)(1)(A)(iii)(II) (noncitizen must show continuous presence to "satisfaction of"

immigration officer); 8 C.F.R §§ 253.3(b)(1)(ii) (burden on noncitizen to show continuous

presence), (b)(6) (same as to parole or admission). The individual is not provided with any

guaranteed minimal time to prepare or means by which to gather evidence, present witnesses, or

review or cross-examine DHS' evidence; nor any right to counsel recognized by the government

or time to obtain counsel—all in sharp contrast to regular removal proceedings, where

individuals are entitled to such safeguards.

62.    For individuals who have been residing in the country for an extended period or

who are apprehended far from the border, the risk of error in the expedited removal process is

particularly high.

63.    For example, the burden is on the individual to "affirmatively show[], to the

satisfaction of an immigration officer" that the length of the individual's continuous presence

makes the individual ineligible for expedited removal.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8

C.F.R 253.3(b)(1)(ii).  Thus, there is a default presumption that, in the absence of this affirmative

showing, any individual arrested anywhere in the country is a noncitizen who has not been

continuously present for two years or more.

64.    That presumption creates numerous difficulties when applied to individuals

apprehended in the interior of the United States, all of whom would need to show not only that

they have been here for two years but also that they have been here *continuously* during that

period, in order to avoid summary removal.

65.    Moreover, under the government's policies, including the February 28 Guidance

and Undisclosed Guidance, individuals faced with proving that they have been continuously

physically present in the United States for two years are not provided notice of the continuous presence requirement, nor guaranteed any time or opportunity to gather evidence that would establish that fact.  That is so even though individuals who are arrested while going about their daily lives—attending religious services, taking their children to school, attending community events, or even simply grocery shopping—are extremely unlikely to be carrying the necessary documentary evidence on their person.

66.     The government's policies and interpretations of the statute and regulations fail to guarantee these individuals, who are detained during the inspection process, with time or any opportunity to gather the necessary evidence, nor even the ability to make a telephone call to someone who could help.  The inspecting officer is not required to make any independent effort to corroborate or verify any information, unless the individual makes a claim of U.S. citizenship; lawful permanent resident, refugee, or asylee status; or having been admitted or paroled.

67.     In addition, the government's expedited removal policies fail to require that the immigration officer assess individuals to ensure that they are mentally competent or otherwise have the capacity to participate in the inspections process, and they fail to require additional safeguards should an individual be found to have competency or capacity issues.

68.     And in the expedited removal process, a noncitizen's removability is determined by a low-level immigration enforcement officer who acts as both prosecutor and judge, rather than by a neutral adjudicator, as required in regular removal proceedings.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).

69.     In addition, the expedited removal policies fail to provide any opportunity for a noncitizen to raise claims that his or her arrest violated a statutory or constitutional requirement.

70.    Over the last two decades, extensive studies have demonstrated that the expedited removal process deprives individuals of a meaningful opportunity to show that they are not subject to expedited removal, or to removal at all.  The government is well aware of the widespread inadequacies and flaws in the expedited removal process and yet has failed to adequately address the problem.  Expanding this process to alleged noncitizens apprehended in the interior of the United States and who are alleged to have resided in the country for less two years is certain to result in even more widespread erroneous removals.

71.    For example, a 2005 study commissioned by Congress documented numerous "serious problems" in the expedited removal process "which put some asylum seekers at risk of improper return."  U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), a*vailable at* https://bit.ly/1GkjQfK ("2005 USCIRF Study").

72.     A 2016 follow-up study "revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures."  *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 2 (2016), *available at* https://bit.ly/2uydMQ8 ("2016 USCIRF Study").

73.    A 2025 follow-up study concluded that "USCIRF is troubled that many of the problems it has repeatedly documented since 2005 in the U.S. government's treatment of asylum seekers in expedited removal—including flawed screening and documentation practices, a lack of training and quality control, inadequate information for noncitizens in the process,

inappropriate detention conditions, and insufficient coordination and oversight—remain unaddressed 20 years later. These flaws raise serious concerns that the United States is erroneously returning asylum seekers to countries where they could face persecution or torture in violation of both U.S. and international law." *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 3 (2025), *available at* http://bit.ly/4kZ3EYv.

74.     Specifically, multiple reports have documented that immigration enforcement officers routinely make factual errors in completing the forms required for expedited removal. Although the officers are required to take sworn statements from the individual, the sworn statements that are recorded in the forms are "often inaccurate and nearly always unverifiable." 2005 USCIRF Study, at 53, 55, 74; *see also* 2016 USCIRF Study, at 21.  The officer taking the sworn statement is often the person translating as well.  Asylum officers, who review expedited removal forms in the course of conducting credible fear interviews, have reported that the forms filled out by immigration enforcement officers commonly contain egregious inaccuracies.  *See, e.g.*, Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 13 (2017) ("Borderland Report"), https://bit.ly/2ZxInuV (describing evidence "that CBP affidavits are often inconsistent with asylum-seekers' own accounts").

75.     Asylum officers also have reported seeing many forms with identical answers, and others with clearly erroneous ones—such as forms indicating that a male noncitizen was asked and answered whether he was pregnant.  *See, e.g.*, 2016 USCIRF Study, at 20-22.

76.     Such factual errors are the natural consequence of a system that lacks procedural protections.  Furthermore, the government's expedited removal policies fail to provide any

adequate check against immigration enforcement officers' failure to comply with required procedures, such as giving the individual an opportunity to review and respond to the statements in the requisite expedited removal forms. For example, asylum seekers commonly report that immigration enforcement officers failed to read their statements back to them but nonetheless pressured them to sign documents. *See, e.g.*, 2016 USCIRF Study, at 20-22. As a result, individuals routinely are deprived of any opportunity to correct errors in their statements before signing.

77.     Reports have documented that immigration enforcement officers have routinely employed coercive tactics to force non-English speaking individuals to sign expedited removal forms in English, without any translation or interpretation. *See, e.g.,* Borderland Report at 13.

78.     Multiple other reports have documented immigration enforcement officers engaging in flagrant intimidation to pressure asylum seekers not to express a fear of return. For example, officers often accuse asylum seekers of lying, falsely tell asylum seekers that they have no right to seek asylum, inform asylum seekers that they will be jailed if they continue to assert a fear of return and refuse to sign the expedited removal order, or prematurely assert that the asylum seekers' claim will not succeed.

79.     The lack of any meaningful administrative review also contributes to errors. For example, although current regulations technically require a supervisor to review the issuance of an expedited removal order, that requirement is limited to review of the paperwork—which, as described above, is often rife with errors and inaccuracies—and does not provide any independent review of the facts or corroboration of the immigration officer's representations. *See* 8 C.F.R. § 235.3(b)(7).

80.     Among the most troubling problems is the widespread failure of immigration enforcement officers to refer noncitizens who express a fear of persecution for interviews with asylum officers, a problem for which the expedited review system offers no recourse.  As a result, numerous asylum seekers have been erroneously removed without any opportunity to speak with an asylum officer or apply for asylum.

81.     A study commissioned by Congress found that in 15 percent of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview.  2005 USCIRF Study, at 53-54.  Another study found that of the numerous individuals interviewed who reportedly told a CBP officer of their fear of return, fewer than half were referred for a credible fear interview before being summarily removed.  *See* Human Rights Watch, *You Don't Have Rights Here* (2014), https://bit.ly/1GocBhZ ("[S]ome said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims.").

82.     Other reports have reached the same conclusion.  *See, e.g.*, Borderland Report, at 12 ("CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum.  In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 12-22  (Nov. 13, 2014), https://bit.ly/1xfFsog (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements

in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

### *Flaws in the Credible Fear Asylum Process*

83.    Even where asylum applicants are referred for a credible fear interview, there are serious flaws in the government's credible fear procedures.

84.    Although the credible fear procedures provide greater safeguards for asylum seekers than for other noncitizens placed into expedited removal, the procedures are inadequate given the complexity of asylum law and the fact that an overwhelming number of applicants are traumatized, do not speak English, and are afraid to be candid at their interviews, especially women and children.

85.    For example, the asylum officer need not create a transcript or audio recording of what occurred at the credible fear interview, a particularly glaring procedural deficiency given the translation problems and misunderstandings that routinely occur in asylum cases.  Instead, the asylum officer must create only a written summary of the "material facts," 8 C.F.R. § 208.30(d)(6), *see also* 8 U.S.C. § 1225(b)(1)(B)(iii)(II), and a written record of "the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution."  8 U.S.C. § 1225(b)(1)(B)(iii)(II).

86.    And, although the asylum officer is required to "determine that the alien has an understanding of the credible fear determination process," 8 C.F.R. § 208.30(d)(2), the government's policies fail to require that the asylum officer or immigration judge assess individuals to ensure that they are mentally competent and have the capacity to meaningfully participate in the credible fear process; they also fail to require additional safeguards should an individual be found to have competency or capacity issues.

87.     Further, although the government recognizes that there is a right before and during the asylum officer interview to consult with a third party, 8 C.F.R. § 208.30(d)(4), the government's policies do not recognize a right to representation by counsel.  Nor do the government's policies recognize a right to counsel prior to or during the immigration judge review hearing of a determination that credible fear has not been shown.  As a result, the government's policies do not guarantee an individual the right to be represented by her own counsel, who could help the individual identify and articulate the key facts relevant to a claim of persecution or torture, which is particularly important given the specialized nature of asylum and protection claims.

88.     Significantly, although the credible fear standard allows the decision maker to consider "such other facts as are known to the officer," 8 U.S.C. § 1225(b)(1)(B)(v), the government's policies do not impose any requirement that the asylum officer or immigration judge fully disclose to the individual all of the other facts that were considered, nor is there any requirement that the individual be given an opportunity to respond to those other facts.

89.     Although during the immigration judge review stage the judge "may receive into evidence any oral or written statement which is material and relevant to any issue in the review," 8 C.F.R. § 1003.42(c), at no point in the process do the government's credible fear policies provide an adequate opportunity to *gather* evidence, including articles or expert testimony which could address country conditions and other key factual questions, such as whether the noncitizen is a member of a particular social group that is being targeted for persecution, or whether the government in their country of origin is unable or unwilling to protect them.

90.     The procedures are further flawed because, for the many individuals who are forced to proceed *pro se*, there is no obligation for the asylum officer or immigration judge to fully develop the record or advise the individual about what he or she must prove to prevail.

91.     That the government's credible fear policies are inadequate is reinforced by the widespread evidence of failures in the credible fear process.  For example, advocates "regularly learn of reports of legitimate asylum seekers who are denied 'credible fear'—and the chance to even file an application for asylum—even though they should meet the standard and may be eligible for asylum.  In some cases, interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered."  Hearing before the H. Judiciary Subcomm. on Immigration & Border Sec. at 5 (Feb. 11, 2015) (statement of Eleanor Acer, Dir., Refugee Protection, Human Rights First) ("Acer Statement"), http://bit.ly/4jjW0au; *see, e.g.*, Letter from Am. Immigration Lawyers Ass'n, et al. to Leon Rodríguez, Dir., U.S. Citizenship & Immigration Servs., and Sarah Saldaña, Dir., U.S. Immigration & Customs Enforcement 2-4 (Dec. 24, 2015) ("AILA Letter"), https://bit.ly/2Yr3DWF ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews.").  In some cases, mothers are called upon to reveal sensitive details of the persecution they faced—including physical or sexual violence or abuse at the hands of other family members—with their children present at their interviews; as a result, critical information is often omitted during these interviews.

92.     These flaws are compounded by the lack of access to counsel.  Few individuals in the credible fear process have the assistance of counsel or any other representative.  Those that

do often cannot be effectively represented due to restrictions on attorney participation and lack of notice of key proceedings. *See, e.g.*, AILA Letter at 3 (explaining that immigration judge review of credible fear determinations "seldom involves attorney participation" because attorneys receive notice of hearings either not at all, or with too little time to prepare and attend such hearings).

93.    There are well-documented systematic inadequacies in interpretation services during the expedited removal process. *See, e.g.*, *Report of the DHS Advisory Committee on Family Residential Centers* 96-99 (2016), https://bit.ly/2yFluu0 (discussing inadequate or nonexistent interpretation services during credible fear interviews and immigration judge reviews of negative credible fear determinations); Borderland Report at 13; 2016 USCIRF Study, at 28 (describing denial of interpretation); Acer Statement at 6 (same).

### *Erroneous Expedited Removals*

94.    The result of the widespread flaws in the expedited removal process is that many individuals have been erroneously removed from the United States.

95.    DHS has removed multiple U.S. citizens pursuant to expedited removal orders. *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order); *de la Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex.) (habeas petition filed Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000), https://tinyurl.com/y4uulrds (recounting expedited removal of U.S. citizen Sharon McKnight).

96.    DHS also has erroneously removed numerous asylum seekers pursuant to expedited removal orders. *See Human Rights Watch*, You Don't Have Rights Here,

https://bit.ly/1GocBhZ; Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland

Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 16-18 (Nov. 13,

2014), https://bit.ly/1xfFsog.

97.    Defendants are aware of the flaws in the expedited removal and credible fear

processes, including the lack of procedural protections. Nevertheless, Defendants have acted to

expand a systematically deficient process to an even larger category of individuals, without

taking steps to address these well-documented problems.

98.    Under the 2025 Rule's expansion of the expedited removal process, the February

28 Guidance and Undisclosed Guidance, any individual apprehended anywhere in the country

could be erroneously subjected to these truncated and flawed procedures and mistakenly

deported without a meaningful hearing. Indeed, the application of expedited removal to the

interior of the country—far from the border—increases the likelihood that citizens, noncitizens

with lawful status, and noncitizens who have lived in the country for years or decades and are

therefore eligible for relief from removal, will be swept up in raids or other enforcement actions

and mistakenly or arbitrarily subjected to expedited removal. Applying expedited removal to

noncitizens who have significant ties to the United States and have resided in communities

across the country for extended periods will exacerbate the existing widespread, systemic

violations of constitutional, statutory, and regulatory rights in the expedited removal process.

### E.    Overbroad Application of 8 U.S.C. § 1182(a)(7)

99.    Expedited removal only applies to noncitizens who are inadmissible on one of

two specified grounds: 8 U.S.C. § 1182(a)(6)(C), which applies to those who seek to procure

immigration status or citizenship via fraud or false representations, or 8 U.S.C. § 1182(a)(7),

which applies to noncitizens who, "at the time of application for admission," fail to satisfy

certain documentation requirements. 8 U.S.C. § 1225(b)(1)(A)(1). If DHS seeks to remove noncitizens based on other grounds, they must afford the noncitizen a full hearing before an immigration judge. *See* 8 C.F.R. §§ 235.3(b)(1), (3).

100.    Defendants construe 8 U.S.C. § 1182(a)(7) to encompass *all* noncitizens present in the United States without having been admitted. Under Defendants' view, therefore, they can apply expedited removal to noncitizens apprehended in the interior of the country by charging them with inadmissibility under § 1182(a)(7), as long as the noncitizen cannot demonstrate two years of continuous physical presence.

101.    Defendants' construction of § 1182(a)(7) is incorrect. The statute's text, context, and history demonstrate that § 1182(a)(7) applies only to those noncitizens who lack documentation at the moment of applying for entry at the border, and not to noncitizens already present inside the country.

102.    Defendants may only apply the expanded scope of expedited removal to those found inadmissible under § 1182(a)(6)(C).

**F.    Harm to Plaintiff.**

103.    MRNY is a nonprofit membership-based organization whose mission includes providing immigration assistance and legal services to members and community members.

104.    MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

105.    MRNY has over 28,000 members residing in New York City, Westchester County, and Long Island.  Its members are overwhelmingly drawn from Spanish-speaking immigrant communities.

106.    Members include noncitizens who have not been admitted to the United States and who have been continuously present for between two weeks and two years, and are thus subject to the 2025 Rule expanding expedited removal, the February 28 Guidance, and Undisclosed Guidance.

107.    For example, MRNY-Jane Doe 2 is a member of MRNY and a noncitizen.  She entered the United States without inspection in March 2024.  She is currently in removal proceedings and she and her family have filed an application for asylum with the immigration court.

108.    MRNY also has numerous members who have lived in the country for longer than two years, but would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so, as is regularly the case when expedited removal orders are issued.

109.    For example, MRNY-John Doe 1 is a member of MRNY and a noncitizen.  He entered the United States without inspection in July 2023, and has been in the country since then.  He is not in removal proceedings and does not have a final order of removal.

110.    MRNY-John Doe 2 is a member of MRNY and a noncitizen.  He entered the United States without inspection in December 2023, and has been in the country since then.  He is not in removal proceedings and does not have a final order of removal.  He filed a timely application for affirmative asylum with USCIS, which remains pending.

111.    MRNY-John Doe 4 is a member of MRNY and a noncitizen.  He entered the United States without inspection in October 2023, and has been in the country since then.  He is currently in removal proceedings.  He filed a timely asylum application in September 2024.

112.    MRNY-Jane Doe 1 is a member of MRNY and a noncitizen.  She entered the United States without inspection in August 2023 and has been in the country since then.  An immigration judge dismissed her removal proceedings.  She is not in removal proceedings and does not have a removal order.

113.    MRNY-Jane Doe 3 is a member of MRNY and a noncitizen.  She entered the United States without inspection in 2002 and has been in the country ever since.  She is not in removal proceedings and does not have a final order of removal. Jane Doe 3 has two minor U.S.-citizen children and would qualify to apply for cancelation of removal in removal proceedings, a form of relief which is unavailable in expedited removal proceedings.

114.    MRNY-Jane Doe 4 is a member of MRNY and a noncitizen.  She entered the United States without inspection in 1999 and has been in the country ever since.  She is not in removal proceedings and does not have a final order of removal.  She filed a U visa application in 2025. In removal proceedings, but not in expedited removal proceedings, she could seek a continuance to await adjudication of her U visa.  She is the mother of U.S.-citizen children, and is also eligible to apply for cancellation of removal if placed in removal proceedings, a form of relief which is unavailable in expedited removal proceedings.

115.    The Trump Administration has announced and exhibited an intent to concentrate immigration enforcement activity in jurisdictions like New York.  Since mid-2025, the immigrant neighborhoods in and around New York City where MRNY has its offices and where many of its members reside have been targeted for intensive immigration enforcement actions.  These areas

include Corona, Queens and surrounding neighborhoods; Bushwick, Brooklyn; Port Richmond, Staten Island; and Brentwood, New York. MRNY has assisted dozens of people, all of them Latino, stopped seemingly at random in these neighborhoods and detained within moments. MRNY members and their relatives have been among those stopped on the street and detained by immigration officers. Immigration officers also actively detain noncitizen New Yorkers at DHS check-in appointments.

116.    MRNY has members who are in removal proceedings. Prior to the order issued on August 29, 2025 in *Make the Road New York v. Noem*, No. 25-cv-0190, ECF No. 65 (JMC), MRNY staff witnessed DHS filing motions to dismiss pursuant to the February 28 Guidance and Undisclosed Guidance at the immigration courts where MRNY members' cases are docketed. *See* Mem. Op. 42 - 43, *Make the Road New York v. Noem*, No. 25-cv-0190 (JMC) (D.D.C. Aug. 29, 2025).

117.    All of the foregoing allegations are incorporated into each of the following claims for relief as if fully set forth therein.

## FIRST CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

118.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."

119.    Plaintiffs' members who are at risk of being subjected to expedited removal under the February 28 Guidance and other Undisclosed Guidance are entitled under the Due Process Clause to meaningful process before they can be removed from the country.

120.    The February 28 Guidance and other Undisclosed Guidance violate the Due Process Clause.

## SECOND CLAIM FOR RELIEF

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))**

121.    8 U.S.C. § 1225(b)(1)(A)(i) provides that a noncitizen who is "inadmissible under [8 U.S.C. §] 1182(a)(7)" may be issued an expedited removal order.

122.    8 U.S.C. § 1182(a)(7) renders inadmissible any noncitizen who "at the time of application for admission" is not in possession of a valid visa or other legal permission to enter.

123.    An individual present in the interior is not inadmissible under 8 U.S.C. § 1182(a)(7) because "at the time of application for admission" denotes the time when a noncitizen seeks permission to enter United States territory.

124.    The February 28 Guidance and other Undisclosed Guidance violate the INA and is "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. §§ 706(2)(A), (C), because they authorize and direct immigration officers to place into expedited removal individuals in the interior of the United States who have been physically present for up to two years based on a determination that they are inadmissible under 8 U.S.C. § 1182(a)(7).  Such individuals may not be found inadmissible on this ground because they have already entered the United States.

## THIRD CLAIM FOR RELIEF

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(a), (b)(1); 8 U.S.C. § 1229(a); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))**

125.    The expansion of expedited removal denies people a meaningful process before they are removed from the United States.  A meaningful process includes, *inter alia*, an opportunity to gather evidence necessary to establish they are not inadmissible and have been continuously present in the United States for more than two years, an opportunity to consult or

rely on the aid of others, including counsel, an opportunity to assert and present evidence that they are not lawfully subject to expedited removal, and an opportunity to meaningfully contest the termination or dismissal of removal proceedings.

126.    The February 28 Guidance and other Undisclosed Guidance violate the Immigration and Nationality Act, 8 U.S.C. §§ 1225(a), (b)(1), and 8 U.S.C. § 1229(a) because the statute must be interpreted to provide minimal procedures to persons faced with expedited removal, to ensure that the process is administered fairly and not applied to persons who are not lawfully subject to expedited removal.  The INA must be interpreted to provide this meaningful process, since otherwise it would violate the Constitution.

127.    Therefore, the February 28 Guidance and other Undisclosed Guidance violate the APA because it is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A), (C), (D).

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

128.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

129.    The February 28 Guidance and other Undisclosed Guidance are arbitrary and capricious because, among other reasons, Defendants failed to articulate reasoned explanations for their decisions; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agency.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 553)

130.    The Administrative Procedure Act, 5 U.S.C. § 553, requires that agencies must generally provide public notice of, and opportunity to comment on, legislative rules before their promulgation.  *See* 5 U.S.C. §§ 553(b), (c).  The APA also requires that any substantive rule must generally be published at least 30 days prior to its effective date.  *See* 5 U.S.C. § 553(d).

131.    DHS did not comply with the APA's procedural requirements when it made the February 28 Guidance and other Undisclosed Guidance immediately effective upon secret internal issuance and without publication.

132.    Defendants' failure to provide for notice and comment violated 5 U.S.C. §§ 553(b) and (c).

133.    Defendants' failure to publish the February 28 Guidance and other Undisclosed Guidance 30 days before their effective date violated 5 U.S.C. § 553(d).

## SIXTH CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1225(b)(1); 8 C.F.R. § 208; Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))

134.    The INA, including 8 U.S.C. §§ 1158 and 1225(b)(1)(A), and its implementing regulations, 8 C.F.R. § 208.1, *et seq.*, grant noncitizens in the United States who are not in removal proceedings the right to file their asylum applications with USCIS.  Such applications are known as "affirmative" applications, in contrast to "defensive" applications that are filed in removal proceedings. A noncitizen who properly files an affirmative application is entitled to present their claim before a USCIS officer in a non-adversarial setting, and to have that claim

adjudicated. If the USCIS officer denies the asylum application, at that point the noncitizen may be referred to removal proceedings.

135. The INA and its implementing regulations do not permit the expedited removal of noncitizens who entered without inspection and have filed affirmative asylum applications with USCIS.

136. By authorizing and directing the expedited removal of such noncitizens who have filed affirmative applications for asylum, the February 28 Guidance and other Undisclosed Guidance are in excess of statutory and regulatory authority and contrary to law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a. Declare the February 28 Guidance and other Undisclosed Guidance unconstitutional and contrary to law;

b. Enter an order staying the effective date of the February 28 Guidance and other Undisclosed Guidance;

c. Enter an order vacating the February 28 Guidance and other Undisclosed Guidance;

d. Enter an order enjoining Defendants from applying the February 28 Guidance and other Undisclosed Guidance to noncitizens who have been present in this country for longer than 14 days or who have been apprehended farther than 100 miles from the border;

e. Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act and any other applicable statute or regulation; and

f. Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: December 19, 2025

Respectfully submitted,

Anand Balakrishnan*
Sidra Mahfooz*
Grace Choi*
Omar C. Jadwat*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
abalakrishnan@aclu.org
smahfooz@aclu.org
gchoi@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org

Lucia Goin (D.D.C. Bar No. 1739389)
American Civil Liberties Union Foundation
Immigrants' Rights Project
915 15th Street NW, 7th Floor
Washington DC 20005
(212) 549-2660
lgoin@aclu.org

Amy Belsher*
Robert Hodgson*
New York Civil Liberties Union Foundation
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org

*/s/ Daniel Galindo*
Daniel Galindo (D.D.C. Bar No. NY035)
Michael K.T. Tan (D.D.C. Bar No. NY0636)
Morgan Russell*
Hannah Steinberg*
Cody Wofsy (D.D.C. Bar No. CA00103)
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
m.tan@aclu.org
mrussell@aclu.org
hsteinberg@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.D.C. Bar No. 235960)
Aditi Shah (D.D.C. Bar No. 90033136)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
ashah@acludc.org

Attorneys for Plaintiffs
* *Pro hac vice application forthcoming*